UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL DEMPKOSKY,                :
                                  :
           Plaintiff              :     CIVIL NO. 4:10-CV-2571
                                  :
      vs.                         :     (Judge Conaboy)
                                  :
MICHAEL J. ASTRUE,                :
COMMISSIONER OF SOCIAL            :
SECURITY,                         :
                                  :
           Defendant              :

## MEMORANDUM AND ORDER

### BACKGROUND

        The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Michael Dempkosky's claim for social security
disability insurance benefits.  For the reasons set forth below we
will affirm the decision of the Commissioner.

        Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  It is
undisputed that Dempkosky met the insured status requirements of
the Social Security Act through December 31, 2004. Tr. 9, 11, 90
and 97.[1]  In order to establish entitlement to disability

---

1.  References to "Tr.__" are to pages of the administrative
record filed by the Defendant as part of his Answer on February
                                              (continued...)

insurance benefits Dempkosky was required to establish that he suffered from a disability as defined in the Social Security Act on or before that date.  42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Dempkosky, who was born on September 30, 1974, graduated from high school and can read, write, speak and understand the English language. Tr.  25, 86, 112, 124 and 149. After high school Dempkosky attended the municipal police academy at the Lackawanna Junior College, Hazleton, Pennsylvania, for one year. Tr. 124-125.

Dempkosky has a limited work and earnings history. Tr. 91, 93-94 and 100.  Records of the Social Security Administration reveal that Dempkosky had reported earnings in 1990 through 1999 as follows:

| | |
|---|---|
| 1990 | $   514.50 |
| 1991 | 1262.63 |
| 1992 | 1068.88 |
| 1993 | 2508.36 |
| 1994 | 8607.83 |
| 1995 | 7932.61 |
| 1996 | 6846.59 |
| 1997 | 12926.65 |
| 1998 | 17482.46 |
| 1999 | 5364.54 |

1.  (...continued)
25, 2011.

Tr. 91. Dempkosky's total earnings from 1990 through 1999, a period of 10 years, were $64,515.05. Id. Dempkosky has no reported earnings after 1999. Id.

Dempkosky's past relevant employment[2] was as a lawn technician which was described as semi-skilled, heavy work by a vocational expert; as a security guard described as semi-skilled light work; and as customer service representative described as skilled, medium work as usually performed but as skilled, heavy work as actually performed by Dempkosky.[3] Tr. 49. Dempkosky's last

---

2.   Past relevant employment in the present case means work performed by Dempkosky during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

3.   The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
>
> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.
>
> (continued...)

3

employment was as a customer service representative for an airline. Tr. 100.

Dempkosky claims that he became disabled on July 15, 1999, because of degenerative disc disease of the cervical and lumbar spine; a cervical disc herniation at the C5-C6 level which abuts the spinal cord; cervical and lumbar radiculopathy; a tendon tear in his right shoulder, a pituitary tumor; low back pain radiating into his leg; weakness in his legs; the inability to remain in position for any extended period of time; and left shoulder and neck pain, migraine headaches and depression.  Doc. 12, Plaintiff's Brief, p. 1; Tr. 24, 58 and 113.  The impetus for Dempkosky's alleged disabling impairments was an incident that occurred while he was working as a customer service

---

3.   (...continued)
        If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

        (c) *Medium work.*  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

        (d) *Heavy work.*  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

representative. Tr. 172, 926 and 948.  Dempkosky contends he was
removing baggage from an aircraft on January 19, 1999, when a
heavy piece of luggage caused him to twist his back.  Id.

Dempkosky protectively filed[4] his application for
disability insurance benefits on April 12, 2007.  Tr. 9, 56, and
86-89.   The application was initially denied by the Bureau of
Disability Determination on August 10, 2007.[5]  Tr. 58-62.  On
September 26, 2007, Dempkosky requested a hearing before an
administrative law judge. Tr. 9.  After about 11 months had
passed, a hearing was held before an administrative law judge on
November 6, 2008. Tr. 19-55.  On November 19, 2008, the
administrative law judge issued a decision denying Dempkosky's
application. Tr. 9-18.  On January 15, 2009, Dempkosky filed a
request for review with the Appeals Council. Tr. 66-69.  After
approximately 21 months has passed, the Appeals Council on October
20, 2010, concluded that there was no basis upon which to grant
Dempkosky's request for review. Tr. 1-3.  Thus, the administrative
law judge's decision stood as the final decision of the

---

4.   Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

5.   The Bureau of Disability Determination is an agency of the
Commonwealth of Pennsylvania which initially evaluates
applications for disability insurance benefits on behalf of the
Social Security Administration.  Tr. 59.

Commissioner. Dempkosky then filed a complaint in this court on December 17, 2010. Supporting and opposing briefs were submitted and the appeal[6] became ripe for disposition on June 27, 2011, when Dempkosky elected not to file a reply brief.[7]

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34,

---

6. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

7. Dempkosky, who was 30 years of age on his date last insured, 34 years of age at the time of the administrative hearing and is presently 37 years of age, is considered a "younger individual" under the Social Security regulations. 20 C.F.R. § 404.1563(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). Younger individuals can more readily adjust to other work. Id.

38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,

8

considering his age, education, and work experience,
engage in any other kind of substantial gainful work
which exists in the national economy, regardless of
whether such work exists in the immediate area in which
he lives, or whether a specific job vacancy exists for
him, or whether he would be hired if he applied for
work.  For purposes of the preceding sentence (with
respect to any individual), "work which exists in the
national economy" means work which exists in significant
numbers either in the region where such individual
lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in
evaluating claims for disability insurance benefits.  See 20
C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process
requires the Commissioner to consider, in sequence, whether a
claimant (1) is engaging in substantial gainful activity,[8] (2) has
an impairment that is severe or a combination of impairments that
is severe,[9] (3) has an impairment or combination of impairments

---

8.  If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further.

9.   The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. § 404.1520(c).  If a claimant has no
impairment or combination of impairments which significantly
limits the claimant's physical or mental abilities to perform
basic work activities, the claimant is "not disabled" and the
evaluation process ends at step two.  Id.  If a claimant has any
severe impairments, the evaluation process continues.  20 C.F.R.
§ 404.1520(d)-(g). Furthermore, all medically determinable
impairments, severe and non-severe, are considered in the
subsequent steps of the sequential evaluation process.  20 C.F.R.
§§ 404.1523 and 404.1545(a)(2).

that meets or equals the requirements of a listed impairment,[10]
(4) has the residual functional capacity to return to his or her
past work and (5) if not, whether he or she can perform other work
in the national economy. Id. As part of step four the
administrative law judge must determine the claimant's residual
functional capacity. Id.[11]

Residual functional capacity is the individual's maximum
remaining ability to do sustained work activities in an ordinary
work setting on a regular and continuing basis. See Social
Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A
regular and continuing basis contemplates full-time employment and
is defined as eight hours a day, five days per week or other
similar schedule. The residual functional capacity assessment
must include a discussion of the individual's abilities. Id; 20
C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual

---

10. If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled. If the claimant does not have an impairment
or combination of impairments that meets or equals a listed
impairment, the sequential evaluation process proceeds to the
next step. 20 C.F.R. § 404.1525 explains that the listing of
impairments "describes for each of the major body systems
impairments that [are] consider[ed] to be severe enough to
prevent an individual from doing any gainful activity, regardless
of his or her age, education, or work experience." Section
404.1525 also explains that if an impairment does not meet or
medically equal the criteria of a listing an applicant for
benefits may still be found disabled at a later step in the
sequential evaluation process.

11. If the claimant has the residual functional capacity to do
his or her past relevant work, the claimant is not disabled.

functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Dempkosky's medical records. We will primarily focus on the medical records that pre-date December 31, 2004, Dempkosky's date last insured.

On January 21, 1999, Dempkosky sought medical treatment from Peter A. Feinstein, M.D., for the injury he allegedly sustained while working as a customer service representative. Tr. 926. A physical examination by Dr. Feinstein revealed negative straight leg raising bilaterally,[12] normal motor and sensory findings in the lower extremities, normal reflexes, no muscle atrophy, no pain when rotating the hips, a normal gait, and no buttocks discomfort. Tr. 927. Dr. Feinstein did observe "some paravertebral discomfort which was bilateral" but "with no

---

12.   The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc. The patient, either lying or sitting with the knee straight, has his or her leg lifted. The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed February 2, 2012).

associated spasm." Id. Dr. Feinstein in reviewing x-rays of
Dempkosky's lumbar spine stated as follows: "X-rays of the lumbar
spine were normal. There was no evidence of disc space narrowing.
There was no evidence of spondylolysis, spondylolithesis[13] or
compression fracture.  There was no evidence of degenerative
arthritis." Id. Dr. Feinstein's diagnosis was "[l]umbar spine
strain or sprain vs. discogenic radiculopathy."[14] Tr. 926.  Dr.
Feinstein prescribed Naprosyn, a nonsteroidal anti-inflammatory
drug, and Flexeril, a muscle relaxant, and found that Dempkosky's

---

13.  "The most common cause of low back pain in adolescent
athletes that can be seen on X-ray is a stress fracture in one of
the bones (vertebrae) that make up the spinal column.
Technically, this conditions is called spondylolysis . . . It
usually affects the fifth lumbar vertebra in the lower back and,
much less commonly, the fourth lumbar vertebra. If the stress
fracture weakens the bone so much that it is unable to maintain
its proper position the vertebra can start to shift out of place.
This condition is called sponylolithesis . . . If too much
slippage occurs, the bones may begin to press on nerves and
surgery may be necessary to correct the condition." Spondylolysis
and Spondylolisthesis, OrthoInfo, Amecian Academy of Orthopaedic
Surgeons, http://orthoinfo.aaos.org/topic.cfm?topic=a00053 (Last
accessed February 3, 2012).

14.  Radiculopathy is a condition where one or more nerves or
nerve roots are affected and do not work properly. The nerve
roots are branches of the spinal cord. They carry signals to the
rest of the body at each level along the spine. The nerve roots
exit through holes (foramen) in the bone of spine on the left and
the right. Radiculopathy can be the result of a disc herniation
or an injury causing foraminal impingement of an exiting nerve
(the narrowing of the channel through which a nerve root passes).
See, generally, Radiculopathy, MedicineNet.com, http://www.
medicinenet.com/radiculopathy/article.htm (Last accessed February
3, 2012).

prognosis was good and that Dempkosky could return to "light duty work with no bending or lifting, at a primarily clerical or sitting type job." Tr. 927.

On February 1, 1999, Dempkosky had a follow-up appointment with Dr. Feinstein "for a lumbar spine strain or strain which occurred after an injury at work." Tr. 924. A physical examination by Dr. Feinstein revealed negative straight leg raising bilaterally, normal motor and sensory findings in the lower extremities, normal reflexes, no pain when rotating the hips, a normal gait and no right or left paravertebral or buttocks discomfort. Tr. 924-925. Dr. Feinstein's diagnosis was "[l]umbar spine strain or sprain with improvement in symptoms." Tr. 924. Dr. Feinstein directed Dempkosky to continue taking Naprosyn and gave him a prescription for "physical therapy three times a week for two weeks." Id. It was further stated that Dempkosky "was given the okay to work light duty, but his employer did not allow him to return in this capacity."[15] Id.

On February 11, 1999, Dempkosky had an appointment with Dr. Feinstein where a physical examination of Dempkosky revealed no change in Dempkosky's condition from the findings made on February 1, 1999. Tr. 922-923. There was no change in Dr.

---

15. As stated earlier the customer service position involved skilled, heavy work as actually performed by Dempkosky.

13

Feinstein's diagnosis and Dempkosky was directed to continue to take Naprosyn and continue with physical therapy. Id.

On February 23, 1999, Dempkosky had an appointment with Dr. Feinstein where a physical examination of Dempkosky revealed no change in Dempkosky's condition from the findings made on February 11, 1999. Tr. 920-921.  There was no change in Dr. Feinstein's diagnosis: "Lumbar spine sprain or strain with improvement in symptoms." Id.  Dr. Feinstein gave Dempkosky a note stating that he could "return to work light duty this Saturday at the ticket booth for a total of two weeks.  He may then start working regular duty as tolerated." Id.

On March 3, 1999, Dempkosky told a physical therapist that his back was "feeling good." Tr. 185.

On March 5, 1999, a physical therapist indicated in a report that Dempkosky stated that his pain was now "2/10 but it only occurs occasionally when stretch (sic) or bending 'too much'" and that "he has no pain [with] all trunk [active range of motion]." Tr. 186.  Also, on March 5, 1999, Dempkosky was discharged from the physical therapy program to a home exercise program. Tr. 187-189.

On March 30, 1999, Dempkosky had an MRI of the lumbar spine. Tr. 954.  The results were normal. Id.  Specifically, the report of the MRI states as follows: "The intervertebral discs are

14

normal in configuration and signal intensity. There is no focal
disc herniation. The neural foramina have a normal configuration.
The vertebral bodies[16] are normal in stature and alignment. There
are no intradural[17] abnormalities and the conus medullaris[18] is
normal." Id.

      From March 8 through April 5, 1999, Dempkosky received
physical/occupational therapy at Allied Services, John Heinz

---

16.   A vertebra consists of several elements, including  the
vertebral body (which is the anterior portion of the vertebra),
pedicles, laminae and the transverse processes.  The vertebral
body is the largest part of the vertebra and is somewhat oval
shaped. The pedicles are two short processes made of bone that
protrude from the back of the vertebral body.  The laminae are
two broad plates extending dorsally and medially from the
pedicles and fusing to complete the vertebral arch (which is the
posterior portion of the vertebra) and encloses the spinal cord.
On an axial view of the vertebra, the transverse processes are
two somewhat wing-like structures that extend on both sides of
the vertebral body from the point where the laminae join the
pedicles. The transverse processes serve for the attachment of
ligaments and muscles. The endplates are the top and bottom
portions of a vertebral body that come in direct contact with the
intervertebral discs.

17.   The dural sac is defined as "[t]he membranous sac that
encases the spinal cord within the bony structure of the
vertebral column. Dural refers to the dura, the name of the
membrane around the spinal cord (and brain, too)." Definition of
Dural sac, MedicineNet.com, http://www.medterms.com/script/
main/art.asp?articlekey=40199 (Last accessed February 3, 2012).
Intradural is inside the dural sac.

18.   The conus medullaris is "the cone-shaped lower end of the
spinal cord, at the level of the upper lumbar vertebrae; called
also c. terminalis and terminal cone of the spinal cord."
Dorland's Illustrated Medical Dictionary, 378 (27th Ed. 1988).

Institute & Outpatient Centers, Pittston, Pennsylvania. Tr. 197-200.

On March 31, 1999, Janice Sepcoski, a registered and licensed occupational therapist and supervisor, at Allied Services, Pittston, completed a functional capacity evaluation of Dempkosky. Tr. 956-957. The results of the evaluation indicated that Dempkosky was "able to work at the MEDIUM-HEAVY Physical Demand Level for an 8 hour day according to the Dictionary of Occupational Titles, U.S. Department of Labor, 1991." Id. On April 2, 1999, Ms. Sepcoski sent a letter to Dr. Feinstein which stated in pertinent part as follows: " 1. Mr. Dempkosky had a fair effort [Functional Capacity Evaluation] at the end of his [WorkFit] program.  2. The client demonstrated a medium-heavy physical demand level during his WorkFit program.  His job demand is 70 pounds for occasional lifting and he was stopped at 70 pounds.  He was able to lift 65 pounds at all levels for a 10 minute circuit during his WorkFit program.  3. Minimal symptom magnification but no inappropriate illness behaviors were noted throughout his WorkFit program." Tr. 955.

On April 6 and May 19, 1999, Dempkosky had appointments with Dr. Feinstein. Tr. 916-919.  The reports of these appointments indicate that Dempkosky had some complaints of pain. Id.  At the appointment on April 6th it was noted that Dempkosky

16

complained "of tightness in his lower back on straight leg raising both legs" and had "discomfort in the musculature of the back with flexion and extension." Tr. 919.  At the appointment on May 19th Dempkosky complained of "decreased sensation in the left thigh" and "some discomfort in his left lower back with tightness." Tr. 917.  Otherwise the physical examinations were normal.

On June 15, 1999, Dempkosky had an MRI of the thoracic and the lumbar regions of the spine. Tr. 953.  The MRI of the thoracic spine was essentially normal other than it showed some "minimal thoracic scoliosis with a convexity towards the left." Id.  The MRI of the lumbar spine was essentially normal other that it revealed "questionable spondylolysis at L5 on the left" and a "[s]light narrowing of the L5 disc space posteriorly." Id.

On July 7, 1999, Dempkosky had appointment with Dr. Feinstein. Tr. 914-915.  The report of this appointment reveals that Dempkosky was "feel[ing] no better that he did when he went back to work in April." Tr. 914.  The results of a physical examination were essentially normal other than "slightly positive straight leg raising bilaterally." Tr. 915.  Dempkosky had Dr. Feinstein reduce his work weight restriction to 30 pounds. Tr. 914.

A nuclear bone scan on August 23, 1999, of the thoracic and lumbosacral spine showed "no focal bony abnormalities to

17

suggest trauma and fracture, spondylolysis, or a degenerative process." Tr. 952.

On August 30, 1999, Dempkosky had an appointment with Dr. Feinstein which revealed essentially normal physical examination findings other than "slightly decreased sensations" in the left calf and thigh and "positive straight leg raising on the left." Tr. 912-913.  Dr. Feinstein prescribed the drug Vicodin and scheduled Dempkosky for an EMG/nerve conduction study.[19] Id.

On September 2, 1999, Dempkosky had the EMG/nerve conduction study performed which revealed "[a]ll motor and sensory nerve conduction findings were within the normal limits . . . bilaterally" and "[n]o objective electrophysiological evidence of lumbosacral nerve root pathology, localized or generalized peripheral neuropathic involvement nor of primary muscle

---

19.  "An electromyogram (EMG) measures the electrical activity of muscles at rest and during contraction. Nerve conduction studies measure how well and how fast the nerves can send electrical signals. . . An EMG is done to: ◆ Find diseases that damage muscle tissue. These problems may include a herniated disc . . . ◆ Find the cause of weakness, paralysis, or muscle twitching. Problems in a muscle, the nerves supplying a muscle, the spinal cord or the area of the brain that controls a muscle can cause these symptoms.  The EMG does not show brain or spinal cord disease.  A nerve conduction study is done to: ◆Find damage to the peripheral nervous system, which include all the nerves that lead away from the brain and spinal cord and the smaller nerves that branch out from those nerves . . . ." Electromyogram (EMG) and Nerve Conduction Studies, WebMD, http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies (Last accessed February 3, 2012).

pathology." Tr. 949. Also, the physical examination on the date of the testing revealed normal active range of motion of the lower extremities, normal reflexes, and normal muscle strength; Dempkosky was able to heel and toe walk with no apparent difficulty; and straight leg raising and sitting root stretch tests were negative bilaterally. Tr. 948.

On September 13, 1999, Dempkosky had an appointment with Dr. Feinstein. Tr. 910-911. The physical examination on that date revealed a normal gait and a slightly positive straight leg raising on the left. Id. Dr. Feinstein told Dempkosky that "he should continue to improve since all his testing has been normal." Id.

At an appointment with Dr. Feinstein on October 27, 1999, Dempkosky told Dr. Feinstein that he had been terminated from his employment because he could not perform the heavy lifting (70 pounds) that his employer was requiring him to do. Tr. 908. A physical examination on this date revealed "some tenderness in the right paravertebral area in the thoracolumbar junction with discomfort radiating to the left lateral thigh region." Id.

On October 28, 1999, Dempkosky had an MRI of the lumbosacral spine which was normal and revealed "no change since" the MRI of March 30, 1999. Tr. 907.

A report of an appointment with Dr. Feinstein on November 9, 1999, reveals that the results of Dempkosky's physical examination were "unchanged from previous" exam. Tr. 906.  At that appointment Dr. Feinstein noted that the results of the recent MRI were "once again" normal and also discontinued Dempkosky's prescription for Vicodin and referred Dempkosky to an acupuncturist for an evaluation. Id.

Our review of the administrative record only revealed two pertinent medical records during the year 2000.  On September 26, 2000, Dempkosky had an appointment with Dr. Feinstein complaining of "trouble in his lower back." Tr. 903.  It was noted that Dempkosky had "not returned to work since last year." Id. The physical examination findings were as follows: "Physical examination unchanged. Mid lumbar paravertebral discomfort with crepitus type sensation to flexion and range of motion.  The rest of the physical examination is negative.  There are no neurological radicular findings." Id.   Dr. Feinstein also noted that he discussed Dempkosky's case "with Bobbie O'Donnell and filled out a Return to Work Evaluation and Functional Capacity and provided this to her at today's visit." Id.   The return to work evaluation form indicated that Dempkosky could engage in at least

the full-range of sedentary work and possibly light work.[20] Tr. 905.

On May 8, 2001, Dempkosky had an appointment with Mark H. Bell, M.D., for pain management. Tr. 720-722. Dempkosky at this appointment complained of lower back pain that occasionally radiates to the left thigh; numbness and tingling running down the left thigh stopping at the knee; stiffness and pain in the morning; and pain that interrupts his sleep. Id. However, Dempkosky told Dr. Bell that the pain did not impact his walking or sitting. Id. A physical examination revealed decreased range of motion in the lumbar spine and "very mild tenderness but no distinct spasm in his paraspinous muscles."[21] Tr. 721. Dempkosky had no sacroiliac joint tenderness. Id. He had normal muscle strength in the lower extremities bilaterally. Id. A sensory examination was essentially normal; his reflexes were normal; his gait was normal; and straight leg raising, Patrick and Maitland tests[22] were negative. Id. Dr. Bell's assessment was that

---

20.  Generally, to engage in the full-range of light work you have to be able to stand/walk up to 6 hours. The form indicates that Dempkosky could stand/walk up to 4 hours. Tr. 905.

21.  Paraspinal muscles are muscles that run essentially parallel to the spine.

22.  The Patrick's (Faber) test is "[a] test to determine the presence or absence of sacroiliac disease; with patient supine, the hip and knee are flexed and the external malleolus is placed
(continued...)

Dempkosky suffered from low back pain, lumbar facet arthropathy and possible left pars fracture.[23] Id. Dr. Bell ordered a repeat MRI and x-ray of the lumbar spine. Id. Dr. Bell also "restart[ed] physical therapy." Id.

An x-ray of Dempkosky's lumbar spine performed on May 11, 2001, revealed that the "[v]ertebral bodies are of adequate height, alignment and density. Disc spaces are preserved. Pedicles and endplates are satisfactory. Soft tissues are unremarkable."

---

22.   (...continued)
above the patella of the opposite leg; this can ordinarily be done without pain, but, on depressing the knee pain is promptly elicited in sacroiliac disease."  Medical Definition of Patrick's Test, Lexic.us, http://www.lexic.us/definition-of/Patrick's_test (Last accessed February 3, 2012). "The Maitland's lumbar SLUMP TEST effectively puts the sciatic nerve under increasing dural tension to test for possible entrapment."Slump Test, Orthorpaedic test, http://www.chiropractic-books.com/Slump-Test.html (Last accessed February 3, 2012);

23.   "The facet joints connect the posterior elements of the [vertebrae] to one another. Like the bones that form other joints in the human body, such as the hip, knee or elbow, the articular surfaces of the facet joints are covered by a layer of smooth cartilage, surrounded by a strong capsule of ligaments, and lubricated by synovial fluid. Just like the hip and the knee, the facet joints can also become arthritic and painful, and they can be a source of back pain.  The pain and discomfort that is caused by degeneration and arthritis of this part of the spine is called facet arthrophathy, which simply means a disease or abnormality of the facet joints." Facet Arthropathy, Back.com, http://www.back.com/causes-mechanical-facet.html (Last accessed February 3, 2012). The facet joints are in the back of the spine and act like hinges, There are two superior (top) and two inferior (bottom) portions to each facet joint called the superior and inferior articular processes. The pars is a portion of the lamina between the superior and inferior facet joints.

Tr. 790.  An MRI of the lumbar spine performed on May 11, 2001,
revealed that "[o]verall, there is little change [from the prior
MRI of October 28, 1999]. Vertebral bodies are of adequate height
and alignment. Marrow signal is homogenous.  There is adequate
disc hydration.  There has been no significant acute interval disc
herniation.  The spinal canal and neuroforamen are stable.  The
conus is within normal limits.  There is no evidence of
intrathecal or paraspinal mass." Tr. 791.

On May 16 and 23, 2001, Dr. Bell administered steroid
injections to the facet joints at the L2 through the S1 level of
the spine bilaterally. Tr. 723-724.  On May 30, 2001, Dr. Bell
administered steroid injections to the neuroforaminal epidural
space at levels L1 through S1 bilaterally. Tr. 725.

Dempkosky's next appointment with Dr. Bell was on
August 16, 2001. Tr. 726.  Dr. Bell in the report of the
appointment stated as follows: "Since the last visit on May 8,
2001, he has had three sets of lumbar facet blocks bilaterally.
Today he notes that his back pain is somewhat better and he has
slightly improved range of motion.  He continues to complain of
sitting intolerance more than fifteen minutes.[24]  He also notes
that he has been having problems sleeping secondary to his back

---

24.  This statement appears to conflict with the statement to Dr.
Bell on May 8, 2001, that pain did not impact his walking or
sitting: "Walking is okay as is sitting." Tr. 720.

pain." Id.  A physical examination revealed "spasm and equivocal tenderness in the paraspinous muscles bilaterally. His range of motion is only decreased in flexion with flexion to about 60 degrees and pulling in his low back and thighs.  Extension and rotation is now painless. Straight leg raising in 90 degrees bilaterally.[25]  He has neither Patrick or Maitland tests bilaterally." Id.  Dr. Bell referred Dempkosky to physical therapy and gave him prescriptions for Zanaflex, Ultram and Ambien. Id.

On September 27, 2001, Richard Somma, M.D., a neurologist at Geisinger Medical Group, Wilkes-Barre, examined Dempkosky and completed a functional capacity assessment.  Tr. 882-886.  Dr. Somma physical examination revealed the following:

> On exam the patient presents as an irritable young man in no acute distress. He has a husky build. Blood pressure is 130/76 and pulse 80 and regular. He has a normal spinal curve. He has no pelvic tilt or leg length discrepancy.  He has no tenderness to spinal percussion.  He has mild tenderness of the paraspinal muscles in the thoracic and lumbar area, although no palpable spasm.  He has mild tenderness over the sacroiliac joints but none in the sciatic notches.  Straight leg rasing and internal and external rotation of the legs at the hips are not painful.  The pulses in the lower extremities are normal.  Muscle bulk, strength and tone in the lower extremities are normal although the patient has a minor tendency to give way proximally because of his low back discomfort. Light touch and pinprick are vaguely diminished over

---

25.  This is a negative finding. See supra note 12.

24

the entire left leg in a nondermatonal pattern.[26]
Temperature, position and vibratory sensation are
intact.  Deep tendon reflexes at the knees and the
ankles are 2 ½ +. The plantar responses are flexor.
Casual gait and toe and heel and tandem walking are all
normal.  Romberg is negative.  The patient has limited
flexion at 60 degrees and extension at 10 degrees at the
lumbar spine because of complaints of pain.  The patient
says that there is a pop in his back that he can feel
when he flexes and extends the waist.  He had me put my
hand over this spot.  I could not feel any popping or
clicking but just the normal movement of the lumbar
vertebrae as he flexed and extended.

Tr. 885.  Dr. Somma stated that Dempkosky suffered from "[l]ow

back pain secondary to mild disk degeneration and bulging at L3-

L4, most likely caused by his work-related injury of January 19,

1999" and an "[a]nxiety disorder exacerbating the patient's

chronic pain syndrome." Tr. 886.  Dr. Somma further stated that

"[a]lthough the patient's condition is permanent, the degree of

his back pain outstrips the minor abnormality on the MRI scan of

his lumbosacral spine.  Mr. Dempkosky has not returned to his

preaccident status.  When he finishes his current physical

therapy, I believe he will have reached maximum improvement apart

from the psychological issue that I feels needs to be addressed.

---

26.   A dermatone is an area of the skin mainly supplied by a
single spinal nerve, There are 8 such cervical nerves, 12
thoracic, 5 lumbar and 5 sacral. A problem with a particular
nerve root should correspond with a sensory defect, muscle
weakness, etc., at the appropriate dermatone. See Stephen
Kishner, M.D., Dermatones Anatomy, Medscape Reference,
http://emedicine.medscape.com/article/1878388-overview (Last
accessed February 2, 2012).

<u>However, I do believe the patient could return to work at this</u>
<u>time in a light-duty capacity.</u>  This work restriction may become
permanent." <u>Id.</u> (emphasis added.)

On October 4, 2001, Dempkosky had an appointment with
Dr. Bell at which Dempkosky complained that physical therapy
worsened his symptoms. Tr.727.  Dr. Bell's report of this
appointment states in pertinent part as follows: "On physical
exam, he has good range of motion. He continues to complain of
pain in all directions although he does seem to be able to extend
and rotate with less discomfort.  He is noted to have bilateral
tightness and mild tenderness in the paraspinous muscles.
Straight leg raising is 90° bilaterally and he has neither
Patrick's nor Maitland's bilaterally. . . . At this point I am
really not sure what is causing all the pain.  I believe it is
appropriate to do a discogram[27] to assess his discs for possible

---

27.  "Discogram is an invasive diagnostic test that uses x-rays
to examine the intervertebral discs of your spine, A special dye
is injected into the injured disc or series of discs. The dye
makes the discs visible on a fluoroscope monitor and x-ray film.
. . A discogram works in two ways – both to view your discs and
to find the source of your pain.  Your doctor injects the dye
into your disc space to try to recreate the pain. If you feel
pain, then that disc is the likely source of your pain. . .  A
discogram is used to evaluate a painful degenerative disc. If the
contrast dye spreads outside the center of the disc, it may
indicate that the disc annulus has tears or has ruptured."
Discogram, Mayfield Clinic for Brain & Spine, http://www.
mayfieldclinic.com/PE-DISCO.htm (Last accessed February 2,
(continued...)

internal derangement." Id. Dr. Bell ordered a discogram from L2 through S1 and continued Dempkosky on Zanaflex. Id.

The discogram was not performed until March 6, 2002. Tr. 729 and 946. The results of that diagnostic testing revealed normal discs at all levels of the lumbar spine except the L3-4 level. Id. When tested at the L3-4 level there was no pain but the "development of muscle ache and spasm with injection." Tr. 729. Radiographic images at that level revealed "contrast [dye] extending to the anterior annulus, the appearance suggesting an anterior annular tear. There is no posterior disc herniation." Tr. 946.

On April 5, 2002, the discogram was interpreted by Dr. Bell as normal. Tr. 731. On that date Dempkosky had an appointment with Dr. Bell. Id. The report of that appointment was

---

27. (...continued)
2012). The intervertebral discs (made of cartilage) are the cushions (shock absorbers) between the 33 bony vertebral bodies that make up the spinal column. Each disc is made of a tough outer layer and an inner core composed of a gelatin-like substance. The outer layer of an intervertebral disc is called the annulus fibrosus. Jill PG Urban and Sally Roberts, Degeneration of the intervertebral disc, PublicMed Central, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC165040/ (Last accessed February 2, 2012); see also Herniated Intervertebral Disc Disease, Columbia University Medical Center, Department of Neurology, http://www.columbianeurosurgery.org/conditions/herniated-intervertebral-disc-disease/ (Last accessed February 2, 2012).

27

dictated by Dr. Bell's physician's assistant Amy Hancock and
states in pertinent part as follows:

> On physical exam, he has limited range of motion in all
> directions.  There is midline tenderness as well as
> bilateral paravertebral tenderness and bilateral S1
> tenderness to palpation.  There is no spasm of his
> muscles noted.  Straight leg raises are 80 degrees
> bilaterally with no radicular signs.  Reflexes are
> 2/4 bilaterally for quadriceps and Achilles.  He is
> negative for Patrick's and Maitland's.
>
> After completing the physical exam, we discussed further
> treatment options.  At this time I feel there are no
> treatments we can offer this patient since he has no
> improvement from any modalities we offered him.
> Because his discography was negative, I suggested he
> seek a second opinion, perhaps from a neurosurgeon.

Id.  Subsequently, on April 14, 2002, Dempkosky had an appointment
with Dr. Feinstein who interpreted the discogram differently from
Dr. Bell. Tr. 901.  Dr. Feinstein stated "[a]lthough this is an
anterior dye leakage, it does represent disc disruption and
discogenic disease, which may be responsible for his pain." Id.

Dr. Feinstein referred Dempkosky to a neurosurgeon,
Stephen K. Powers, M.D., Professor of Neurosurgery, at Hershey
Medical Center. Tr.  988-999.  Dr. Powers after reviewing
Dempkosky's medical records and examining Dempkosky concluded that
Dempkosky

28

> may have a form of tethered cord[28] and is having back
> pain which is aggravated by standing and placing the
> back in a lordotic position and accentuating the overall
> pull on the conus.  He seems to relieve himself with
> hyperflexion.  My recommendation is that he be treated
> with a series of exercises intended to increase his
> abdominal muscle tone and try to straighten the
> lumbar spine as much as possible at the lumbosacral
> junction through various hip flexor exercises, as well
> as abdominal rectus muscle exercises.  I do not believe
> the disc abnormality at L3-4 is symptomatic.  Certainly,
> if it were, I would expect his symptoms to be increased
> with flexion, and it is the opposite for him.  I do not
> believe he has any clear evidence of any facet joint
> disease on the basis of the studies that we have been
> told about or on the basis of his signs and symptoms.
> Conservative management is appropriate, and this patient
> is not, in my opinion, a surgical candidate at all.

Tr. 989.  Based on Dr. Power's report, on July 18, 2002, Dr. Bell

recommended that Dempkosky "undergo a course of physical therapy

with the presumed diagnosis of tethered cord." Tr. 519.

The record reveals that Dempkosky had at least two more

appointments with Dr. Bell in 2002 and physical therapy through

December 2002. Tr. 361, 521, 528-529 and 733-734.  On December 12,

2002, Dr. Bell after noting that Dempkosky's "imaging studies and

diagnostic testing . . . reveal[ed] no significant pathology" and

---

28.  A tethered spinal cord is a situation where the spinal cord
is abnormally attached within the spinal column. It is usually a
condition that develops in children with spina bifida. Tethered
cord syndrome, The Wisconsin Chiari Center, http://www.wichiari
center.org/oth/Page.asp?PageID=OTH000008 (Last accessed February
3, 2012).

"there is nothing further that we can do for Michael," referred Dempkosky to Dr. Feinstein for a second opinion.  Tr. 734.

Dempkosky had an appointment with Dr. Feinstein on December 30, 2002 and January 2, 2003. Tr. 900 and 929.

At the appointment on December 30, 2002, Dempkosky complained about a new ailment. Id.  Dempkosky stated that he was having a problem with radiating pain in his left neck, shoulder and arm and down to his left forth and fifth fingers. Id.  Dr. Feinstein stated that Dempkosky's "complaints and presentation" were "consistent with an underlying, either brachial plexopathy[29] or radiculopathy." Id.  Dr. Feinstein ordered an upper extremity EMG/nerve conduction study and an MRI of the neck and shoulder area. Id.

At the appointment on January 2, 2003, Dempkosky complained of numbness in his leg and weakness in his foot. Tr. 900.  A physical examination of Dempkosky revealed "positive straight leg raising with paravertebral muscle discomfort," intact reflexes and sensation, and "[n]o obvious motor weakness[.]" Id.

---

29.  Brachial plexopathy is "pain, decreased movement, or decreased sensation in the arm and shoulder due to a nerve problem. . . It occurs when there is damage to the brachial plexus, an area where a nerve bundle from the spinal cord splits into the individual arm nerves." Brachial plexopathy, A.D.A.M. Medical Encyclopedia, PubMed Health, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002391/ (Last accessed February 3, 2012).

Dr. Feinstein's diagnosis was "[q]uestion radiculopathy versus discogenic disease despite extensive conservative care by Dr. Bell." Id. Dr. Bell directed that Dempkosky have another MRI and EMG/nerve conduction study. Id. Dr. Feinstein noted the unrelated problem with Dempkosky's neck and shoulder. Id.

On January 7, 2003, Dempkosky had an EMG/nerve conduction study of the lumbar region/right lower extremity which was normal and revealed "no electrophysiological evidence of neuropathy, myopathy or lumbar radiculopathy." Tr. 939.

An MRI of the lumbar spine was conducted on January 9, 2003, which revealed little change from the prior MRI of May 11, 2001, and an "[o]verall, stable appearance to the lumbar spine[.]" Tr. 944.

On January 13, 2003, Dempkosky had an EMG/nerve conduction study of the left upper extremity which was "mild[ly] abnormal" and revealed "[f]indings suggest[ive of] left C5 radiculopathy" and "[n]o electrophysiological evidence of compressive median or ulnar neuropathy or brachial plexopathy on left." Id.

On January 29, 2003, Dempkosky had an appointment with Dr. Feinstein to discuss the results of his EMG/nerve conduction studies. Tr. 898. Dr. Feinstein noted that the "lower extremities appear to be benign" but that the "upper extremities have findings

31

consistent with a left C5 radiculopathy, which would correlate
with his clinical complaints and findings." Id.

An MRI of the cervical spine was conducted on January
31, 2003, which revealed at the C5-6 level "a tiny left
paracentral disc herniation, which abuts upon the anterior surface
of the cervical cord"; at the C4-5 level a possible "tiny rent in
the annulus to the right of midline" and "minimal disc bulging";
at the C3-4 level "a tiny osteophyte [bone spur] to the left" and
"minimal disc bulging";  and at the C6-7 level "a possible tiny
tear in the annulus[.]" Tr. 937.  The report of the MRI further
stated that "[t]here are no focal abnormalities of the cervical
cord" and "[t]here is no central canal or neuroforaminal
narrowing." Tr. 937.

On February 3, 2003, Dempkosky completed a "Neck
Disability Index" questionnaire. Tr. 593-594.  In that
questionnaire Dempkosky stated that his neck pain was moderate;
that he can look after himself normally with respect to personal
care without causing extra pain; that pain prevents him from
lifting heavy weights off the floor but that he can manage if they
are conveniently positioned, e.g., on a table; that he can
concentrate fully when he wants to with slight difficulty; that he
can do most of his usual work but no more; that he can't drive his
car as long as he wants to because of moderate neck pain; that his

sleep is greatly disturbed; and that he is able to engage in most but not all of his usual recreational activities because of pain in his neck. Id.

A medical note by Dr. Feinstein dated February 5, 2003, states in part as follow: "The MRI scan is positive for a very small abnormality at the C5-6 level on the left side, which would be consistent with the nature of his clinical complaints and Nerve Conduction Test and EMG. He just started therapy and I would like to try and treat this conservatively, in terms of traction and physical therapy with medication." Tr. 928. At an appointment with Dr. Feinstein on February 26, 2003, Dempkosky told Dr. Feinstein "that the physical therapy help[ed] him." Id.

On February 28, 2003, Dempkosky had an MRI of the left shoulder which revealed the following: "The rotator cuff apparatus is intact without evidence of a tear. There is no joint effusion, nor is there fluid in the subacromial bursa. The glenoid labra are intact. The marrow signal is normal for the patient's age. There are no degenerative changes at the AC joint nor is there evidence of impingement. The remainder of the imaged soft tissue appears normal." Tr. 816. The report did note the possibility of a "small subchondral cyst without significant marrow edema" at the "head of the humerus." Id.

33

A medical note by Dr. Feinstein dated March 26, 2003, states in part as follow: "MRI is available. It shows no significant pathology in his shoulder that I can identify . . . He has not had any relief with the physical therapy." Tr. 928. Dempkosky continued with physical therapy through April 18, 2003. Tr. 358.

On May 15, 2003, Dempkosky had an appointment with Dr. Bell. Tr. 735.  The report of that appointment notes that his last visit was on December 12, 2002, and that since that prior appointment he had been taking several medications and "doing relatively well with the treatment combination." Id.  Dempkosky stated that "his low back pain is left sided with no radiating pain into the extremities." Id.  A physical examination revealed a negative straight leg raising test and normal strength in the lower extremities. Id.  Dr. Bell scheduled Dempkosky for lumbar facet block steroid injections. Id.  Dempkosky received those injections on May 28 and June 4, 2003. Tr. 736-737 and 739.

On June 21, 2003, Dempkosky completed a "Neck Disability Index" questionnaire. Tr. 591-592.  In that questionnaire Dempkosky stated that his neck pain was very mild; that he can look after himself with respect to personal care without causing extra pain; that he can lift only very light weights; that he can read as much as he wants to with moderate pain in the neck; that

34

he has no headaches "at all;" that he can concentrate fully when he wants to with slight difficulty; that he can do most of his usual work, but no more; that he can't drive his car as long as he wants to because of moderate neck pain; that his sleep is moderately disturbed; and that he is able to engage in all his recreational activities with some pain in his neck. Id.

Dempkosky continued to have appointments with Dr. Bell through the end of 2003 and additional lumbar and cervical steroid facet block injections and an injection into the left supraspinatus muscle.[30] Tr. 741-742 and 746-753. He also continued to have similar physical examination findings or slightly improved findings. Id. Also, on September 5, 2003, Dempkosky apparently had an appointment for the first time with Moises Kaweblum, M.D., a pain management specialist. Tr. 743-744. A physical examination on that date revealed that Dempkosky had a normal gait, was able to walk on his toes and heels and was able to squat without difficulty. Tr. 743. Dempkosky's had normal motor strength. Id. Dr. Kaweblum concluded that Dempkosky suffered from "left subacromial bursitis with partial rotator cuff tear and

---

30. The supraspinatus muscle runs along the top of the shoulder blade from the neck to the head of the upper arm bone (the humerus). It holds the head of the humerus in place and is essential for the forward motion of the humerus when throwing objects.

35

left cervical facet pain syndrome with muscle spasm in his upper trapezius." Id.  It appears that Dr. Kaweblum gave Dempkosky a therapeutic injection in the left subacromial bursa. Id.

On January 20, 2004, Dempkosky had an MRI of the left shoulder which revealed "[o]n one axial image, a suggestion of an anterior glenoid tear," normal tendons and rotator cuff, no evidence of a rotator cuff tear, no fluid within the subacromial or subdeltoid bursa, normal biceps tendons, and "some scattered low signal foci within the bones" which "likely represent bone islands[31] in a patient of this age." Tr. 815.

On or about January 23, 2004, Dempkosky had an appointment with James M. Mattucci, M.D., regarding his left shoulder and neck pain. Tr. 802-803. A physical examination of Dempkosky at that appointment revealed "full range of motion of the cervical spine," "no tenderness over the sternoclavicular or acromioclavicular joints," "full range of motion of the shoulder and no pain with cuff testing" and "excellent strength throughout the whole left upper extremity[.]" Id.  These findings were set forth in a letter to a referring physician. Id.  Dr. Mattucci in that letter also stated the following: "I am not impressed by this gentleman's overall exam.  He has previously seen Dr. Feinstein as

---

31.  "Bone islands" are benign growths of bone or cartilage inside a bone usually within the marrow.

well as Dr. Togut who assessed him for possible thoracic outlet
syndrome. He is going to be seeing Dr. Prebola in early February
and he is also scheduled to have and EMG/nerve conduction study
test to assess the ulnar nerve. I don't think this is his
shoulder at all. It seems to be coming from his neck and
trapezius area. His MRI shows a midline herniation, but this is
minimal. I have told him to see Dr. Prebola and to have his EMG
and I will see him back in about 5-6 weeks for a recheck." Id.

On March 10, 2004, Dempkosky had a follow-up appointment
with Dr. Mattucci the report of which states in toto as follows:
"Michael returns for follow up and is still having some pain in
his shoulder. He also has some tenderness in the AC joint.[32] I
have injected his AC joint today as well as his subacromial space
and he tells me that he is instantly better before the medicine
completely went into the joint. I am not sure whether or not this
is psychosomatic or whether or not it really helped him. I will
see him back in a few weeks to check his progress. He does do a
job where he does a lot of lifting at the airport[33] and I have

---

32. The AC joint is the acromioclavicular joint which is at the
top of the shoulder. It is where the collar bone (clavicle) meets
the hightest point of the shoulder blade (scapula). The hightest
point of the scapula is the acromion.

33. According to Dempkosky's testimony at the administrative
hearing, he did not work after 1999. Furthermore, the records of
(continued...)

37

seen a lot of baggage handlers in the past who have had this type of problem so maybe AC arthropathy [joint disease] is the problem although it did not really show up much on his MRI. I will see him back in 3-4 weeks." Tr. 799. Dempkosky had appointments with Dr. Mattucci on April 7, September 15, and October 13, 2004. Tr. 799-798. Dr. Mattucci notes reveal that he continued to doubt that Dempkosky's problem was with his shoulder. Id.

On June 2, 2004, Dempkosky had an appointment with Dr. Kaweblum regarding low back pain. Tr. 754. This appointment was scheduled after Dempkosky called Dr. Kaweblum's office multiple times. Id. A physical examination revealed limited lumbar spine range of motion with pain upon extension and rotation; paravertebral tenderness along the left lower side of his back; no sacroiliac joint tenderness or muscle spasm; negative straight leg raise bilaterally; negative radicular symptoms; normal reflexes and muscle strength; and the ability to stand on his heels and toes and walk while doing the same without difficulty. Id. The report of this appointment also stated that Dempkosky had "recently [been] diagnosed with a pituitary adenoma [benign tumor] in January 2004." Id.

---

33. (...continued)
the Social Security Administration do not reveal earnings after 1999.

38

The record reveals that during the remainder of 2004
Dempkosky attended regular physical therapy sessions for both his
lumbar spine and shoulder pain and also received therapeutic
injections administered by both Dr. Bell and Dr. Mattucci.   Tr.
276-278, 283-289,  384-390, 396-401, 403-414, 483, 755-762 and
801.

On November 5, 2004, Dempkosky completed a questionnaire
regarding his low back pain. Tr. 500.   Dempkosky stated in that
questionnaire that his low back pain was mild and did not vary
much; that the pain prevented him from lifting heavy weights but
that he could manage light to medium weights if they were
conveniently positioned; and that he could not walk at all without
increasing the pain. Id.

On December 15, 2004, Dempkosky had a neurological
consultation with Kenneth L. Hill, M.D., at the Hershey Medical
Center regarding his pituitary tumor. Tr. 635-636.   The
neurological examination of Dempkosky on that date was essentially
normal. Id. Dempkosky had a normal gait, intact cranial nerves,
normal muscle strength and normal sensation. Id.   Dr. Hill
reviewed the MRI scans of Dempkosky's brain and stated as follows:
"There does appear to be a 5 mm pituitary lesion off to the right
but no mass effect both superiorly, inferiorly, or lateral;
otherwise, the MRI is grossly normal to exam.   This small

39

abnormality in the pituitary region does not seem to be problematic, and I would not recommend any surgical treatment at current.  I would like to see him in followup in 1 year with a repeat MRI scan to document progression of this tumor for it may just be an incidental finding at this time." Tr. 636.

On December 16, 2004, Dempkosky had an MRI of the left shoulder which revealed "a small irregular partial tear in the [rotator] cuff along the posterior margin of the supraspinatus tendon" but "no evidence of a full-thickness tear" and "there [did] not appear to be significant shoulder impingement." Tr. 813. On December 29, 2009, Dr. Mattucci interpreted this MRI as being "essentially negative." Tr. 796.

An MRI of the cervical spine conducted on March 30, 2005, revealed mild degenerative disc disease and no disc extrusions. Tr. 818.  On June 6, 2005, a physician's assistant for Dr. Kaweblum examined Dempkosky and found that his lumbar range of motion was full and functional and his neurological exam was normal. Tr. 765.

On December 14, 2005, Dempkosky had a 1-year follow-up MRI of his brain at Hershey Medical Center. Tr. 631-632.  Also, on December 14, 2005, Jonas M. Sheehan, M.D., Assistant Professor of Neurology, reviewed that MRI scan, compared it with Dempkosky's prior scan and concluded that the December 14, 2005, MRI scan

40

revealed no change from the previous MRI scan. Id.  Dr. Sheehan
also examined Dempkosky and found that he was "alert, awake, and
conversant with grossly intact visual fields and normal cranial
nerves." Id.  Dr. Sheehan stated that he did not think the
"lesion" was significant. Id.

On April 5, 2006, Dempkosky had an MRI of the cervical
spine which was normal and revealed "no evidence of disc
herniation, canal or foraminal stenosis." Tr. 509.

An MRI of the Dempkosky's brain conducted on May 5,
2006, revealed no "significant interval change" in the pituitary
adenoma. Tr. 622-623.

On August 6, 2007, Theodore C. Waldron, D.O., reviewed
Dempkosky's medical records on behalf of the Bureau of Disability
Determination and concluded that as of Dempkosky's date last
insured (December 31, 2004) Dempkosky could engage in practically
the full range of light work.  Tr. 979-985.

**DISCUSSION**

The administrative law judge at step one of the
sequential evaluation process found that Dempkosky had not engaged
in substantial gainful work activity from July 15, 1999, through
December 31, 2004, his date last insured. Tr. 11.

At step two of the sequential evaluation process, the
administrative law judge found that Dempkosky had the following

41

severe impairments: low back pain and muscle spasm, lumbar facet
syndrome, degenerative disc disease of the lumbar spine, right
shoulder bursitis/rotator cuff tear, cervical facet arthropathy,
neck pain, and chronic headaches. Tr. 11.  The administrative law
judge found that Dempkosky's pituitary tumor and depression were
not severe impairments.

   At step three of the sequential evaluation process the
administrative law judge found that Dempkosky's impairments did
not individually or in combination meet or equal a listed
impairment. Tr. 13.

   At step four of the sequential evaluation process the
administrative law judge found that Dempkosky through the date
last insured had the residual functional capacity to perform a
limited range of unskilled, sedentary work.  Tr. 13.
Specifically, the administrative law judge found that Dempkosky
could perform sedentary work but

> he must avoid occupations that require balancing,
> stooping, kneeling, crouching, crawling, climbing on
> ladders, ropes or scaffolds, overhead work, or frequent
> movements of the head.  He must be afforded the option
> to sit and stand during the work day, for brief periods
> of 1-2 minutes every hour or so.  He must avoid
> occupations that require overhead reaching, pushing and
> pulling with the upper and lower extremities to include
> the operation of hand levers and pedals.  He must
> avoid even moderate exposure to environments with poor
> ventilation, hot or cold temperature extremes, excessive
> noise and vibration, and extreme dampness and humidity.
> As a result of a mild mental impairment and the

> effects of pain and medications, he is limited to
> occupations requiring no more than simple, routine,
> repetitive tasks, not performed in a fast-paced
> production environment, involving only simple, work-
> related decisions, and in general, relatively few
> work place changes.

Tr. 13-14.  In concluding that Dempkosky had the residual

functional capacity to engage a limited range of sedentary work,

the administrative law judge relied, inter alia, on the opinion of

Dr. Waldron, the state agency physician, and Dr. Feinstein's

September 27, 2000, functional assessment of Dempkosky. Tr. 16,

905 and 979-984.  He further found that Dempkosky's statements

about his alleged symptoms and limitations were not credible to

the extent they prevented him from engaging in a limited range of

sedentary work.  Id.

At step five, the administrative law judge based on a

residual functional capacity of a limited range of sedentary work

as described above and the testimony of a vocational expert found

that Dempkosky had the ability to perform unskilled work as a

visual inspector, a surveillance system monitor, and a desk guard,

and that there were a significant number of such jobs in the state

and local economies. Tr. 17.

The administrative record in this case is 1117 pages in

length and we have thoroughly reviewed that record.  The

administrative law judge did an adequate job of reviewing

43

Dempkosky's vocational history and medical records in his
decision. Tr. 16-18. Furthermore, the brief submitted by the
Commissioner sufficiently reviews the medical and vocational
evidence in this case. Doc. 13, Brief of Defendant.

Dempkosky argues that the administrative law judge erred
by disregarding the opinions of his treating physicians. He
further argues that the administrative law judge's residual
functional capacity determination is not supported by substantial
evidence and that the administrative law judge failed to
adequately assess Dempkosky's credibility. We find no merit in
Dempkosky's arguments.

No treating physician has provided a functional
assessment of Dempkosky indicating that he is or was unable to
perform any type of work for the requisite 12-month statutory
period. In fact a treating physician, Dr. Feinstein, in 2000,
found that Dempkosky could engage in the full-range of sedentary
work and a limited range of light work.

The administrative law judge's residual functional
capacity assessment is clearly supported by the medical records
and the opinions of Dr. Feinstein and Dr. Waldron. It is also
supported by the functional capacity evaluations completed by Ms.
Sepcoski, a registered and licensed occupational therapist, and
Dr. Somma, a neurologist. Ms. Sepcoski concluded that Dempkosky

could engage in at least medium work.  Dr. Somma found that
Dempkosky could engage in light work.

        As for the alleged error by the administrative law judge
in accessing Dempkosky's credibility, the administrative law judge
was not required to accept Dempkosky's claims regarding his
limitations.  See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir.
1983)(providing that credibility determinations as to a claimant's
testimony regarding the claimant's limitations are for the
administrative law judge to make).  It is well-established that
"an [administrative law judge's] findings based on the credibility
of the applicant are to be accorded great weight and deference,
particularly since [the administrative law judge] is charged with
the duty of observing a witness's demeanor . . . ."  Walters v.
Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997);
see also Casias v. Secretary of Health & Human Servs., 933 F.2d
799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact,
the individual optimally positioned to observe and assess the
witness credibility.").  Because the administrative law judge
observed Dempkosky when he testified at the hearing on November 6,
2008, the administrative law judge is the one best suited to
assess the credibility of Dempkosky.

        Our review of the administrative record reveals that the

45

decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

RICHARD P. CONABOY
United States District Judge

Dated: February 7, 2012